UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROLANDA GONTZ,<br><br>    Plaintiff,<br><br>v.<br><br>FISHER SCIENTIFIC,<br><br>    Defendant. | Case No. _____<br><br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

NOW COMES Plaintiff, Roland Gontz, by and through her attorney, Blaire Patrick, Esquire, and files this Complaint alleging as follows:

### I. Nature of the Action

Plaintiff brings this Complaint to recover damages under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, similar provisions under the Pennsylvania Human Relations Act ("PHRA") 43 P.S. § 955 *et seq.* and the FMLA 29 U.S.C § 2601 *et seq.* Plaintiff has a disability under the ADA and the PHRA and was terminated due to her disability and interfered with her FMLA.

### II. Jurisdiction and Venue

1. This action arises under the ADA, 42 U.S.C. § 12101 *et seq.* the FMLA 29 U.S.C § 2601 *et seq.* This Court has jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1331.

2. This Court has supplemental jurisdiction over Plaintiff's discrimination claims pursuant to 28 U.S.C. § 1367(a).

3. Plaintiff is a resident and citizen of Pennsylvania, a substantial part of the events or omissions giving rise to the claims occurred in Western Pennsylvania, and, therefore, this action is within the jurisdiction of the United States District Court for the Western District of Pennsylvania and the venue is proper pursuant to 28 U.S.C. § 1391(b).

4. Plaintiff filed a charge with the Equal Employment Opportunity Commission (EEOC), which issued him a right to sue letter on August 10, 2017.

### III. Parties

5. Plaintiff, Rolanda Gontz ("Plaintiff"), is an adult individual residing at 324 Questend Ave., Pittsburgh, PA 15228.

6. Defendant, Fisher Scientific ("Defendant"), is a business with a location at 300 Industry Dr., Pittsburgh, PA 15275.

### IV. Facts

7. Plaintiff began her employment with Defendant in January 2013 as a temporary employee in the QA department.

8. Plaintiff then became a permanent employee and was moved to the sales department as a sales representative.

9. In the year prior to October 2015, Plaintiff began suffering manifestations of an unknown and undiagnosed debilitating vestibular condition.

10. Due to her health condition, Plaintiff applied for FMLA in October 2015.

11. Plaintiff was approved for FMLA in November 2015.

12. In December 2015, Plaintiff was diagnosed with Meniere's Disease.

13. On November 16, 2015 Plaintiff was called into a meeting with her manager, Jeff Linden ("Mr. Linden") and human resources representative, Megan McKay ("Ms. McKay")

14. At the time of this meeting, both Ms. McKay and Mr. Linden were aware of Plaintiff's pending FMLA application.

15. The purpose of the meeting was to give Plaintiff a verbal warning due to tardiness.

16. Plaintiff's tardiness was a direct result of her disability.

17. Some days, Plaintiff would wake up with severe vertigo and dizziness and unable to leave her home until she took her medication and the medication took effect to improve her symptoms.

18. Plaintiff's disability was not something she could control prior to a bout of dizziness. When she would wake up with severe symptoms, she could control it with medication after the fact but was unable to fully prevent the symptoms from occurring.

19. Plaintiff was still able to perform the essential functions of her position.

20. During Plaintiff's meeting with Ms. McKay and Mr. Linden, they were aware of Plaintiff's disability and request for FMLA.

21. Plaintiff was further informed during this meeting that she was no longer permitted to use her earned unscheduled paid time off ("PTO").

22. Ms. McKay produced a policy regarding unscheduled PTO time from 2001 and stated that Plaintiff was not permitted to use her unscheduled PTO.

23. Every other employee working for Defendant was permitted to use their PTO for whatever reason they choose.

24. Plaintiff was verbally warned on that date for being tardy despite Plaintiff having a flexible schedule.

25. There is no "official start time" for her position. As long as Plaintiff was in the office during core hours, there were no issues.

26. Everyone in Plaintiff's position were permitted to arrive at work in a flexible manner.

27. Starting in November 2015 until June 2016 Plaintiff was called into Ms. McKay's office on numerous occasions to change her requirements on how she was to track her FMLA time.

28. On or about May 18, 2016, Plaintiff was called into a meeting with Ms. McKay.

29. Plaintiff asked to record the meeting and her request was denied.

30. Plaintiff wanted to record the meeting as she had been harassed numerous times and given different instructions regularly for the prior six months in regard to her disability and leave.

31. Plaintiff asked to leave the meeting.

32. Ms. McKay stated, if she left, she would be written up for an unexcused absence.

33. This was a policy in which Ms. McKay admitted was not posted for employees to review nor was it enforced by Defendant.

34. In May 2016, Plaintiff was written up for leaving early on one occasion and was accused of having two unexcused absences.

35. Per policy, Plaintiff (and other employees) were permitted two unexcused absences per year.

36. Both of Plaintiff's unexcused absences were paid via PTO.

37. Plaintiff was then informed of numerous absences from April 2015 until November 2015, which were prior to her official disability diagnosis and her application for FMLA.

38. This was the first time Plaintiff became aware of any issue with her prior attendance.

39. Defendant waited for more than a year to write her up for her prior absences.

40. On or about June 7, 2016 Plaintiff arrived to work and was told by a coworker that "HR is on the warpath" and that they believe "HR is doing a head count reduction."

41. Plaintiff was called into human resources on that date and was questioned about a candle business that she was considering staring outside of work.

42. Plaintiff did not have an actual candle business at that time.

43. Plaintiff was asked what type of glass she used to pour her candles into.

44. Plaintiff stated that she purchases her glass from Goodwill.

45. She went to her office to produce a candle she had made using an old Tom & Jerry cartoon glass that she had purchased at Goodwill.

46. Plaintiff was then asked by human resources why she had "no charged" a $20.00 case of jars from the Defendant.

47. Plaintiff informed them that she had done so in order to fill them with candy to send to clients to showcase a recent promotion for Defendant on glass jars.

48. Sending samples is common practice for Plaintiff and other sales representatives to send to clients when a glass promotion was running.

49. All of Plaintiff's "no charges" for promotional jars were approved by management.

50. Plaintiff was informed by human resources that she was suspended while Defendant investigated her "no charge."

51. Several days later Plaintiff was called by Defendant and told that the "investigation is still ongoing" and that she was "not permitted to talk to anyone at Fisher."

52. After that phone call, Plaintiff was terminated for "violating policy."

53. Plaintiff questioned what policy she had violated and was told "just a policy."

54. Three other disabled employees had been terminated in the year prior to Plaintiff's termination due to vague "policy violations" as pretext to terminate them due to their disabilities.

55. Plaintiff was harassed due to her disability and ultimately terminated due to her disability and in retaliation for using her approved FMLA time.

### V. Allegations

### Count I
### Disability Discrimination
### Wrongful Termination in Violation of the ADA, 42 U.S.C. § 12101 *et seq.*

56. The preceding paragraphs are incorporated herein as if set forth at length.

57. Plaintiff is an Employee in relation to the ADA.

58. Defendant is an Employer in relation to the ADA.

59. Plaintiff was fully qualified to perform all aspects of her job.

60. Plaintiff has a "disability" as defined under the ADA because she suffers from Meniere's Disease.

61. Defendant was aware of Plaintiff's disability.

62. Plaintiff was disciplined for tardiness despite having a flexible schedule.

63. Plaintiff was harassed in regard to usage of her PTO when she had an issue with her disability.

64. Defendant wrote up Plaintiff for absences which occurred more than a year prior to the write up.

65. Defendant had terminated other disabled individuals using vague "policy violations" as pretext to terminate them, as they terminated Plaintiff.

66. Defendant unlawfully terminated Plaintiff in violation of the ADA.

67. Plaintiff was damaged by Defendant's actions.

## Count II
### Disability Discrimination
### Wrongful Termination in Violation of the PHRA 43 P.S. § 955 *et seq*.

68. The preceding paragraphs are incorporated herein as if set forth at length.

69. Plaintiff is an Employee in relation to the PHRA.

70. Defendant is an Employer in relation to the PHRA.

71. Plaintiff was fully qualified to perform all aspects of her job.

72. Plaintiff has a "disability" as defined under the PHRA because she suffers from Meniere's Disease.

73. Defendant was aware of Plaintiff's disability.

74. Plaintiff was disciplined for tardiness despite having a flexible schedule.

75. Plaintiff was harassed in regard to usage of her PTO when she had an issue with her disability.

76. Defendant wrote up Plaintiff for absences which occurred more than a year prior to the write up.

77. Defendant had terminated other disabled individuals using vague "policy violations" as pretext to terminate them, as they terminated Plaintiff.

78. Defendant unlawfully terminated Plaintiff in violation of the ADA.

79. Plaintiff was damaged by Defendant's actions.

## Count III
### Violation of the FMLA 29 U.S.C § 2601 *et seq*.

80. The preceding paragraphs are incorporated herein as if set forth at length.

81. Defendant employs more than 50 people.

82. Defendant was on notice Plaintiff suffered from a disability that required FMLA.

83. Defendant began to harass Plaintiff in regard to using her FMLA time and attendance issues shortly after she had applied for FMLA.

84. Defendant disciplined Plaintiff due to tardies and previous absences while she was on FMLA.

85. Defendant terminated Plaintiff using the pretext of a "policy violation" to discrimination against her for using her approved FMLA time.

86. Plaintiff was damaged by Defendant's actions.

### Request for Relief

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment against the Defendants for the following:

   a. Loss of back wages to date;

   b. Front pay, where appropriate;

   c. Other benefits of employment lost as a result of Defendant's unlawful conduct;

   d. Compensatory, additional liquidated or punitive damages;

   e. Plaintiffs' legal fees;

   f. Court costs; and

   g. Other such relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Respectfully Submitted,

*/s/ Blaire Patrick*

Blaire Patrick, Esq.
**KRAEMER, MANES & ASSOCIATES, LLC**
**ID No. 318332**
U.S. Steel Tower
600 Grant Street, Suite 4875
Pittsburgh, PA 15219
412.626.5595 (p)
412-283-6050(f)
bp@lawkm.com

9